## Continuation of Application for Search Warrant

I, Geoffrey Yandl, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, depose and state as follows:

### INTRODUCTION

1. I am employed by the ATF as a Special Agent (SA).  I have been employed as a federal law enforcement officer since 2004.  During this time, I was employed as a United States Secret Service Agent for approximately three years.  I have been employed as an ATF Special Agent since March 2007.  I have received special training in federal firearms crimes and their investigation at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have also received training in social media and its use in crime.  I have investigated numerous violations of federal law, including violations that have involved the use of computers and the internet.  ATF Agents are authorized to investigate violations of Title 18 of the United States Code.  ATF Agents are authorized to investigate violations found in Title 18 and Title 21 of the United States Code.

2. The information set forth in this continuation is based upon my personal observations, my training and experience, and information obtained from other agents and officers of the ATF, the West Michigan Enforcement Team (WEMET), and other witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Upon information and belief, a Facebook account identified by Uniform Resource Locator (URL) **www.facebook.com/tsm.shepg** (Display Name: *FreebandGang Imakeepjuggn*; User ID Number: 587047714) maintains evidence of violations of federal criminal laws including 18 U.S.C. § 922(g)(1), 18 U.S.C. § 924(c), and 21 U.S.C. § 841(a)(1), and other offenses.

4. There is probable cause to believe that the service of a search warrant on Facebook account **www.facebook.com/tsm.shepg** will lead to evidence, fruits, and instrumentalities of the aforementioned crimes, as well as the identification of individuals who are engaged in the commission of those and related crimes.  There is probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

### PROBABLE CAUSE

5. On or about March 2, 2017, Ottawa County Sheriff's Deputy Boersema was contacted by Rashirle Allen's father, Raymon Parker.  Mr. Parker requested police conduct a well-being check of Rashirle Allen at the Best Western hotel in Holland, Michigan.  Mr. Parker reported that Allen was at the Best Western with another subject.  That subject had posted video images on Facebook of himself holding a firearm.  Mr. Parker reported the subject's Facebook profile screen name is *FreebandGang Imakeepjuggn*.

6. Ottawa County Sheriff Deputy Boersema requested assistance from Detective Roger Willard.  Detective Willard viewed the video and identified the subject as Shawn STRICKLAND.  The

video, posted on March 2, 2017 at approximately 1430 hours, portrays STRICKLAND holding a black semiautomatic handgun.

7.  The video was shown to the Best Western manager Elizabeth Curley.  Ms. Curley confirmed that the video background and décor was that of the Best Western hotel rooms.  Ms. Curley also confirmed that STRICKLAND often rents rooms at the hotel.  Ms. Curley reported that, on February 26, 2017, STRICKLAND checked into room 133 with Rashirle Allen.

8.  Detective Tyler Kempema viewed known photos of Shawn STRICKLAND and confirmed that he was the same person as in the video holding the handgun.

9.  A criminal history check of Shawn STRICKLAND found that he was previously convicted of felonies on November 13, 2014 for possession of a weapon by a felon, and on March 30, 2011 for aggravated/armed robbery.

10.  Detectives applied for and obtained a search warrant for room 133 of the Best Western hotel in Holland, Michigan.  Once inside, detectives located a bag containing approximately 50 grams of cocaine and a loaded .40 caliber handgun.  Officers also located and seized $3,160 in small denomination bills.  The occupants were identified as Shawn STRICKLAND and Rashirle Allen, DOB XX/XX/95.

11.  STRICKLAND was advised of his rights pursuant to *Miranda*.  STRICKLAND originally denied any knowledge of the firearm.  When confronted with the Facebook video post, STRICKLAND admitted that he momentarily possessed the firearm, but did not own it.  STRICKLAND denied knowing who owned the firearm or drugs.  The firearm was found to be reported stolen to the Chesterton Police Department in Indiana.

12.   On March 3, 2017, ATF emailed a preservation of account letter, pursuant to 18 U.S.C. § 2703(f), to Facebook.com for the Facebook account **www.facebook.com/tsm.shepg**.  Facebook assigned the preservation request to case number 1037195.

13.  On May 16, 2017, a grand jury indicted STRICKLAND for violations of 21 U.S.C. § 841(a)(1), 18 U.S.C. §§ 922(g)(1) & 924(c).  There is currently a warrant pending for STRICKLAND's arrest.  Law enforcement is currently unaware of his whereabouts.

14.  On May 8, 2017, a review of the public Facebook account **www.facebook.com/tsm.shepg** found the following information which provided your affiant confidence that it is being utilized by Shawn STRICKLAND:

   a.  At least 20 photographs and videos depicting Shawn STRICKLAND;
   b.  Biographical information regarding STRICKLAND; and
   c.  Associations with family and friends.

## FACTUAL BACKGROUND

15.  Facebook is an online social media service utilized by public and private entities including individuals.  Facebook offers services including private and public messaging, photo and video sharing, and groups for the discussion of common interests.

16. Based on my knowledge, training, and experience, I know that instant messages that can only be viewed by the sender and receiver can be sent via Facebook's instant messaging service. Additionally, I am aware that access to Facebook content may be restricted by the Facebook user to specific individuals. Therefore, law enforcement officers investigating the aforementioned criminal activity may not be able to view the full contents of the aforementioned Facebook page absent a search warrant.

17. Based on my knowledge, training, and experience, I am aware that Facebook, in addition to maintaining administrative records on its customers also maintains records of communications made using the electronic service. The electronic service provider can provide information regarding use of services, time of services, and content of information conveyed via the electronic service. The records maintained by Facebook are further described in Attachment A.

18. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

19. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "friend request." If the recipient of a "friend request" accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "friends" and a "news feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

20. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

21. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "timeline," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

3

22. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

23. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

24. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

25. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

26. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

27. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

28. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

29. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

4

30. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; timeline postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

31. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

32. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

33. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account

owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

34. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

35. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B, dating from March 1, 2017, to the present.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate items that will assist with the purpose of the warrant, described in Section II of Attachment B.

## CONCLUSION

36. Based on the forgoing, I request that the Court issue the proposed search warrant.

37. I am advised by the U.S. Attorney's Office that this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that—has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

38. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

39. I am advised by the U.S. Attorney's Office that the notice requirement of Fed. R. Crim. P. 41(f)(1)(C) applies to the service provider, not to the subscriber or customer of the service, pursuant to 18 U.S.C. § 2703(b)(1)(A).  *See United States v. Bansal*, 663 F.3d 634, 662-63 (3d Cir. 2011).  Finally, although the Government is not required to provide notice to the subscriber or customer, I am aware that Facebook may have instituted a business policy of notifying subscribers of the receipt of legal process unless ordered by a court not to do so.  The U.S. Attorney's Office has advised me that 18 U.S.C. § 2705(b) provides authority for the Court to command the recipient of a warrant or other order issued under Section 2703 not to notify any other person of the existence of such warrant or order if the Court finds reason to believe that such notice would result in danger to a person's life or safety, flight from prosecution, destruction of evidence, witness intimidation, or other serious jeopardy to an investigation.  I request that the Court order Facebook not to disclose the existence of this warrant because notice would likely give targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates.  Although

Section 2705(b) does not set a time limit for the duration of a non-disclosure order, I submit that a period of 180 days, subject to extension upon a showing of need by the Government, would be reasonable.